[67,68,69]

**NOT FOR  PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ARMKEL, LLC | : | Civil Action No. 02-4206 (FLW) |
|  | : |  |
| Plaintiff, | : |  |
| v. | : | **OPINION** |
|  | : |  |
| PFIZER INC., | : |  |
| Defendant - Third-Party | : |  |
| Plaintiff | : |  |
| v. | : |  |
|  | : |  |
| APPLIED BIOTECH, INC. and | : |  |
| APOGENT TECHNOLOGIES, INC., | : |  |
|  | : |  |
| Third-Party Defendants. | : |  |

**APPEARANCES:**

For Defendants-Third-Party Plaintiff, Pfizer Inc.:
N. Richard Powers
Gerard M. O'Rourke
Connolly Bove Lodge & Hutz, LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899

Warren W. Faulk
Brown & Connery LLP
360 Haddon Ave.
Westmont, NJ 08108

For Third-Party Defendant, Apogent Inc.:
David R. Cross

Quarles & Brady, LLP
411 E. Wisconsin Ave., Suite 2040
Milwaukee, WI 53202

Kerri E. Chewning (KC-5898)
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, NJ 08033

For Third-Party Defendants, Applied Biotech Inc.,
Glenn S. Kerner
Goodwin Proctor LLP
103 Eisenhower Parkway
Roseland, NJ 07068


**WOLFSON, District Judge**

        Presently before the Court are three separate motions for summary judgment on Pfizer

Inc.'s ("Pfizer") third party complaint.  Pfizer seeks indemnification from Apogent Technologies,

Inc. ("Apogent") and Applied Biotech Inc. ("ABI") for breach of ABI's contractual obligation to

defend, indemnify and hold Pfizer harmless from patent infringement claims related to the

manufacture and sale of the e.p.t.® pregnancy test.  Pfizer moves for partial summary judgment

alleging that ABI was obligated to indemnify it for patent infringement claims brought by patent-

owner Armkel LLC ("Armkel") and that ABI and Apogent[1] are liable for the damages Pfizer

incurred as a result of Pfizer's settlement with Armkel for $18 million.

        Apogent moves for summary judgment dismissing Pfizer's third-party complaint.

Apogent alleges that ABI's indemnification obligation was not implicated by the Armkel claims

_____

        [1] Apogent is the corporate parent of ABI and pursuant to an agreement between Apogent
ABI, and Pfizer, Apogent has guaranteed ABI's obligations to Pfizer; in a subsequent stock
purchase agreement, Apogent also agreed to defend and indemnify ABI for claims relating to the
e.p.t.® test.

because ABI was only liable for patent claims arising out of its own proprietary information. Alternatively, Apogent argues that even if the indemnification obligation is implicated by the Armkel claims, ABI is still not liable because Pfizer breached the parties' agreement by failing to obtain ABI's consent prior to settling with Armkel.  Moreover, Apogent argues that the settlement amount was not reasonable because, inter alia, Pfizer did not allocate the settlement amount among covered and uncovered claims.

Finally, ABI moves for summary judgment dismissing Pfizer's complaint.  ABI contends that because Apogent has guaranteed the performance of ABI's obligations and liabilities to Pfizer, to the extent ABI is held liable, Apogent has indemnified ABI for any financial obligation it may incur.

The Court has considered the moving, opposition and reply papers, and for the reasons set forth below, Pfizer's Motion for Partial Summary Judgment will be granted in part and denied in part and  Apogent's and ABI's Motions for Summary Judgment will be denied.

I.      BACKGROUND

In February 1993, Pfizer's predecessor, Warner-Lambert[2] ("WL"), entered into a supply agreement ("Agreement") with ABI in which ABI agreed to supply Pfizer with its e.p.t.® pregnancy test. (Complaint ("Compl.") at ¶ 3).  The e.p.t.® is an over-the-counter pregnancy test that detects the presence of the hormone human chorionic gonadotrophin ("hCG") in the urine of pregnant women.  (Apogent Fact Statement ("Apogent FS") at ¶ 23).  The test is contained in a

---

[2]WL was acquired by Pfizer in 2000 and Pfizer succeeded to WL's rights under the Agreement with ABI. For the sake of simplicity, the Court will refer to WL as Pfizer.

plastic housing and is comprised of a wick, sample pad, nitrocellulose strip containing the "test zone" antibodies and the "control zone" antibodies, and an absorbent pad. (Powers Decl. Ex. 31; Cross Certification Ex. X). The e.p.t.® performs an immunoassay test[3]: when urine is applied to the test's wick it travels from the sample pad to a fiberglass pad where it picks up anti-hCG antibodies (a monoclonal antibody) and a small gold particle (gold sol) that, in large quantities, appears magenta to the naked eye. (Cross Certification Ex. C at 6-8; Apogent Mot. for Summary Judgment ("SJ") at 12.) If there is hCG in the urine, the anti-hCG antibodies bind to hCG and flow towards the "test zone" and, if enough complexes form, a colored line appears in the test zone indicating pregnancy. (Apogent Mot. for SJ at 13). Regardless of whether there is hCG present, there is an additional reaction in the "control zone" where the gold-labeled antibodies react with immobilized antibodies to create a magenta line in the control zone indicating that the test has been used successfully. (Id. At 14).

Although the general format of the test was available in the public domain, ABI developed certain parts of the e.p.t.® test including the identity and chemical/biological make-up of the monoclonal antibody, the immobilized antibodies, and the antibodies used in the conjugate solution. (Pfizer Fact Statement ("Pfizer FS") at ¶ 28-32). Moreover, under the Agreement, ABI was responsible for manufacturing the pregnancy test strips, assembling the strips together with plastic housings, and packaging the tests to be shipped to Pfizer ready for resale. (Apogent's Mot. for SJ at 3). Pfizer was responsible for marketing, distributing, advertising and servicing e.p.t.® customers. (Apogent FS at ¶ 2). Pfizer did not manufacture or design any part of the test

[3]According to Apogent's Brief, "Immuno" refers to the immunological reaction that creates antibodies; "assay" means a test. (Apogent's Mot. for SJ at 12.)

4

until 1996 when Pfizer designed its own plastic casing for the test which ABI was required to use in the manufacture of the e.p.t.®.   (Id.; Cross Certification Ex. HH, Pfizer's Amended and Supplemental Responses to ABI's Requests for Admissions at ¶¶ 4 & 19).

In addition to ABI's manufacturing obligations, Pfizer and ABI negotiated various provisions and warranties in the 1993 Agreement.  (Powers Second Decl. Ex. AK, Costa Dep.; Powers Second Decl. Ex. AL, Renkin Dep.; Cross Certification Ex. II, Renkin Dep.). Importantly, the parties negotiated the inclusion of an indemnification agreement in which ABI agreed to "defend, indemnify and hold [Pfizer] harmless" for losses "arising out of or resulting from the use of the Patents or **Know-how** by WL, FHC, or ABI in connection with the manufacture, use or sale of Products under this agreement."  (Powers Decl. Ex. 6 § 6.3; Cross Certification Ex. L § 6.3) (emphasis added).  "Know-how" was defined in Section 1 of the Agreement as "any **Intellectual Property owned or controlled** by ABI....necessary or useful in the registration, manufacture, use or sale of Products." (Id. at  § 1; id. at § 1)(emphasis added). Further, the parties defined "Intellectual Property" broadly to include all patents and patent rights, trademark and trademark rights, trade names, service marks, brand names, inventions, processes, formulae, copyrights, logos, slogans, trade secrets, models, processes, designs, methodologies, technical and other information or data, manufacturing and know-how.  (Id.).

Moreover, in section 7.1(f), ABI warranted that, "[n]o other Intellectual Property other than Know-how is used or necessary to develop, manufacture, supply and market the Products." (Id. at § 7.1(f); id. at § 7.1(f)).  Finally, section 13.5 of the Agreement contained an integration clause which stipulated that the Agreement constituted "the entire agreement between the parties and supersedes all previous communications, representations, agreements or understandings,

either oral or written, between the parties." (<u>Id.</u> at § 13.5; <u>id.</u> at § 13.5).

Pursuant to the Agreement, ABI manufactured the e.p.t.® pregnancy test from 1993 until 2002. (Powers Decl. Exs. 6 & 7; Cross Certification Exs. L & M). Thereafter, Pfizer switched to a new supplier, Mizuho. (Cross Certification Ex. K). In 1999 and 2001, while ABI was still supplying Pfizer with the e.p.t.®, Pfizer invoked the above-mentioned indemnification clause in response to two patent infringement suits[4] brought by Inverness Medical Corporation[5] ("Inverness"). (Pfizer FS ¶ ¶ 53-54). The first Inverness action alleged that the ABI-supplied e.p.t.® product infringed three patents. (Powers Decl. Ex. 111). The complaint also alleged that Pfizer's infringement was willful and sought treble damages. (<u>Id.</u> at ¶ 24). On April 2, 1999, ABI agreed to defend the first action and be bound by the full amount of any final judgment, (Powers Decl. Ex. 114), although the parties dispute why ABI so agreed. Inverness brought a second patent infringement action against Pfizer in May 2001, alleging that the ABI-supplied product infringed a fourth patent. (Powers Decl. Ex. 39). Pfizer again invoked the indemnification clause of the supply agreement and ABI defended Pfizer for the second Inverness claim. (Pfizer FS at ¶¶ 56-58; Apogent FS at ¶ 91).

In April 2001, shortly before the second Inverness suit, Pfizer and ABI began to negotiate a revised supply agreement. (Pfizer's FS at ¶ 59). On August 8, 2001, the parties executed an amendment to the original agreement ("Amendment") which altered ABI's indemnification obligations under section 6.3. (Powers Decl. Ex. 7 at ¶ 12; Cross Certification Ex. M at ¶ 12).

---

[4]The parties dispute the admissibility of evidence pertaining to their prior course of dealing under the indemnification provision in the Agreement. See discussion p.27 <u>infra</u>.

[5]The Inverness complaint was originally filed as <u>Conopco v. Warner Lambert Company</u>; Conopco was Inverness' predecessor and for the sake of simplicity, the Conopco suit will be referred to as Inverness throughout the opinion.

Although the definition of claims that would implicate the indemnification clause remained identical to those in the original agreement, the Amendment limited the indemnification obligation to claims arising prior to September 1, 2001, and limited losses to monetary damages attributable to e.p.t.® sales before August 31, 2001.  (Id.).  In addition, paragraph 12(d) provided that ABI's obligation to indemnify under section 6.3 would survive termination or expiration of the Agreement.  (Id. at ¶ 12(d)).

The Amendment also altered the consent provision of the original Agreement.  The original consent provision required ABI to obtain WL's written consent prior to "resolv[ing] any claim or potential claim, Action or Proceeding relating to the Products, Patents or Know-how." (Powers Decl. Ex. 6 at § 6.5(a)).   The Amendment replaced section 6.5(a) with the following language: "Neither ABI nor WL [Pfizer] shall settle or otherwise resolve any claim or potential claim, Action or Proceeding relating to the Products without the prior written consent of the other party, which consent shall not be unreasonably withheld."  (Id. at ¶ 14).  Finally, section 9.1 of the Agreement was amended to read: "Unless terminated in accordance with the provisions of this Section 9, this agreement shall terminate on June 30, 2002."  (Powers Decl. Ex. 7 at ¶ 17; Cross Certification Ex. M at ¶ 17).  Finally, only certain provisions of the Agreement, such as the indemnification clause, were expressly exempted from termination; the remaining provisions were scheduled to terminate on June 30, 2002.

On September 9, 2002,  Pfizer was served with a complaint by Armkel alleging that the e.p.t.®  infringed Armkel's patents for an immunoassay method of detecting hCG.  (Pfizer Ex. 51).  Armkel recounted the numerous ways in which the e.p.t.® product infringed its patents and detailed the manner in which the internal components of the e.p.t.® pregnancy test corresponded

to the claims of the Armkel patents[6].  (Powers Decl. Ex. J., at 6-23; Cross Certification Ex. D at 6-23).   Armkel's claims against Pfizer were based on two patents that were issued to Carter-Wallace[7] beginning in 1998.  (Armkel Compl. at ¶¶ 6-8; Apogent's FS at ¶ 45).  Specifically, Armkel alleged that Pfizer's e.p.t.® infringed Charlton, U.S. Patent No. 5,714,389 ("'389 patent")[8] which issued on February 3, 1998 and Charlton U.S. Patent No. 5,989, 921 ("'921 patent") which issued on November 23, 1999.  (Pfizer FS at ¶ 82; Apogent FS at  ¶ 4).[9]

Because the patent applications only became public after the patents issued, the patent assignees – first Carter-Wallace and then Armkel – could do nothing about the availability and use of the immunoassay technique until that time.  (Apogent Mot. for SJ at 20).   However, on February 27, 1998, three weeks after the first Charlton  patent issued, Carter-Wallace contacted WL and ABI and put them on notice of the patent and its applicability to over-the-counter immunoassays including e.p.t.®.  (Powers Decl. Ex. 51; Powers Decl. Ex. U at 15-17).   At that

---

[6] Armkel's claims are set out in Armkel's responses to Pfizer's First Set of Interrogatories.  Under each patent, Armkel lists its different claims and the ways in which the ABI-supplied e.p.t.®  infringes each claim. For example, under the '389 patent, Armkel's Claim 1 recites seven ways in which the e.p.t ®  infringes; Claims 3, 5, 6, and 7 each recite one way in which the e.p.t infringes and Claim 9 and 10 each depict seven ways that the e.p.t ®  infringes.

[7]Carter-Wallace was acquired by Armkel in September 2001.

[8]David Charlton had applied for the patents in 1988. Ten years later, the patents began to issue and were initially assigned to Charlton's employer Carter-Wallace, and later to Armkel, pursuant to Armkel's 2001 acquisition of Carter-Wallace.

[9]The parties dispute whether the Armkel complaint alleged infringement of a third patent, U.S. Patent 6,485,982 ("'982 patent") which issued on November 26, 2002. (Powers Decl. Ex. Y, PZ 117452-56).  On January 8, 2003, Armkel sent a proposed Amended Complaint to Pfizer that added ABI as a co-defendant and alleged that the ABI-supplied product infringed the '982 patent. (Id.)  Although Armkel never filed the amended complaint, (Powers Second Decl. Ex. AA), Armkel's interrogatory responses included claims that the ABI-supplied e.p.t.®  product infringed the '982 patent; (Powers Decl. Ex. J at 15-23).  However, Pfizer objected to defending this claim because the '982 patent was not a patent in suit. (Powers Decl. Ex. I at 2).

time, both WL and ABI recognized that the patent claims were broad and ABI's in-house

counsel, Stephen Tomassi ("Tomassi"), advised that the e.p.t.® appeared to infringe the patent.

(Pfizer FS at ¶ 83-84; Powers Decl. Ex. Q at 81-82; Powers Decl. Ex. U, Tomassi Tr. 15-17).

Moreover, WL and ABI agreed that the defense to infringement of the '389 patent was weak.

(Pfizer FS at ¶ 84; Apogent's Response to Pfizer FS at ¶ 84).

     However, Pfizer did not hear anything further about the potential infringement of the

Charlton patents until September 9, 2002, when Pfizer was served with Armkel's complaint.  On

October 15, 2002, Pfizer wrote to ABI formally invoking the indemnification clause. (Powers

Decl. Ex. 25).  ABI responded two days later that the notice was untimely and further, ABI

expressed reservations as to whether the Armkel complaint fell within the indemnification

clause.  (Powers Decl. Ex. 26).  Pfizer disagreed that notice was untimely, and, to provide ABI

more time, offered to obtain a further extension of time to respond to the complaint.  (Powers

Decl. Ex. 28).  On December 5, 2002, ABI orally advised Pfizer that it would neither defend nor

indemnify Pfizer in connection with Armkel's patent infringement suit. As a result, Pfizer

undertook defense of the infringement claims on its own.

     During the discovery phase, Armkel and Pfizer commenced settlement discussions.

(Powers Decl. Ex. C).  Initially, on the basis of Armkel's estimate of e.p.t.® sales and profit

margin, Armkel stated that it would seek $37 million dollars royalty, enhanced damages for

willful infringement, and interests and costs.  (Powers Decl. Ex. 11).  Based on this evaluation,

Armkel offered to settle its claims for $25 million and running royalty.  (Id.).  Pfizer made a

counter offer of $2.7 million dollars and no running royalty.  (Powers Decl. Ex. 12).  On June 11,

2003, the parties met to negotiate a settlement. Although they had failed to reach a settlement,

Pfizer raised its offer to $8 million dollars and Armkel lowered its demand to between $20 and

$25 million dollars and abandoned the running royalty requirement. (Pfizer Ex. T, Sturman Tr.

208-09).

On June 23, 2003, with the assistance of Magistrate Judge Donio, the parties reached a

final settlement of $18 million dollars.  (Powers Decl. Ex. 3).   The settlement covered past

infringement, as well as a paid-up license to make, use and sell the e.p.t.® product through June

30, 2004.  ( Id. at § 6.1).  The parties did not allocate specific portions of the $18 million to past

infringement, the paid-up license, the Mizuho product or punitive damages.

On December 18, 2003, Pfizer filed a third-party complaint against ABI and Apogent; it

has moved for partial summary judgment on this complaint pursuant to Fed. R. Civ. P. 56(c).

Pfizer alleges (1) that ABI breached its indemnification obligation under the Agreement and

Amendedment by denying that Armkel's complaint was an event triggering the indemnification

clause and by refusing to defend, indemnify and hold Pfizer harmless from Armkel's allegation

of patent infringement; and (2) that Apogent is liable for ABI's refusal to defend, indemnify and

hold Pfizer harmless by virtue of its guarantee of ABI's performance.  Specifically, Pfizer

contends that the indemnification obligation in section 6.3 of the agreement requires ABI to

indemnify Pfizer for all claims arising out of or related to the e.p.t.® whether the claims were

based on proprietary or non-proprietary information that ABI used to manufacture the e.p.t.®

test.

Apogent and ABI move separately for summary judgment dismissing Pfizer's Third-Party

Complaint.  Apogent contends that ABI's indemnification obligation was not implicated by the

Armkel claim because ABI was only obligated to indemnify Pfizer for claims arising out of

ABI's proprietary information that was used to manufacture e.p.t.®  Alternatively, Apogent argues that even if the indemnification obligation is implicated by the Armkel claim, Pfizer repudiated the Agreement by breaching the consent provision and settling with Armkel without securing ABI's consent.  Moreover, Apogent argues that the settlement amount was not reasonable.  ABI contends, in turn, that it has no liability to Pfizer because Apogent has guaranteed all its obligations to Pfizer under an agreement between Pfizer, ABI and Apogent, and pursuant to a subsequent indemnification provision in a stock purchase agreement, whereby Apogent agreed to indemnify ABI.

Despite their dispute over the extent of ABI's indemnification obligation under the Agreement, the parties agree that the general format of the e.p.t.® pregnancy test was available in the public domain. (Pfizer's Response to Apogent's FS at ¶ 22 ("It is admitted that the general format of the pregnancy test product made for Pfizer by ABI was known in the art."); Pfizer's Response to Apogent's FS at ¶ 42 ("Admitted that the general concept of an immunoassay sandwich format was not proprietary to ABI.")).   In addition, the parties agree that other general concepts relating to immunoassay pregnancy tests were generally known including: the use of a plastic housing, a wick, a nitrocellulose strip, fiberglass material for the conjugate pad, and the use of gold sol to produce a visible color to indicate a positive result. (Apogent FS at ¶ 20; Chang Tr. 271:9 -291: 18; Pfizer's Response to Apogent FS at ¶ 25, 37-39).

In addition, the parties agree that much of the e.p.t.® test may be considered proprietary to ABI.  According to the testimony of Dr. Shung-Ho Chang ("Chang"), then-president of ABI, the following parts of the e.p.t.® may be considered proprietary: (1) the monoclonal antibody used at the test site; (2) the polyclonal antibody; (3) the process by which the antibodies were

11

immobilized onto the nitrocellulose strip; (4) the buffer solutions used to dry the antibodies; (5) the antibodies used in the conjugate solution; (6) the identity of some of the biological materials and chemicals; and (7) some of the manufacturing and assembly processes.  (Chang Tr. 112, 126, 127, 139, 140, 142, 143, 157, 159-160, 162, 166, 167; Pfizer FS at ¶¶ 25, 28-32).  Moreover, the parties do not dispute that access to information pertaining to every step of the manufacturing of the test was controlled by ABI.  (Chang Tr. 126:17-22).

## II.   Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact exists, the nonmoving party may not rest upon mere allegations, but must present actual evidence in support thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290 (1968)).  In evaluating the evidence, the Court must view evidence and draw inferences "in the light most favorable to the party opposing the motion."  Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

### B. Contract Interpretation: Ambiguous Language and Extrinsic Evidence

The dispute between Pfizer and ABI/Apogent focuses on the language contained in the

12

indemnification clause of the Agreement which requires ABI to defend, indemnify and hold Pfizer harmless from claims "arising out of or resulting from the use of the Patents or **Know-how**. . . in connection with the manufacture, use and sale of" the e.p.t. test.®.  (Powers Decl. Ex. 6 § 1) (emphasis added).  Specifically, the parties contest whether ABI was required to indemnify Pfizer only for claims related to ABI's proprietary information that ABI used in the manufacture of e.p.t.® or if ABI was obligated to indemnify Pfizer for all patent claims arising out of the product whether based on ABI's proprietary or non-proprietary information.

Importantly, the Court notes that the term "proprietary" does not appear in any relevant section of the Agreement and the parties have not defined the term.  Despite the conspicuous absence of the term, the parties have created a dichotomy between proprietary and non-proprietary information in their briefing and they have relied on this distinction to contest the use and meaning of the term "Know-how" as it is defined in the Agreement.  The Agreement defines "Know-how" as "any intellectual property **owned or controlled** by ABI. . . necessary or useful in the registration, manufacture, use or sale of Products." (Powers Decl. 6 § 1)(emphasis added). Moreover, intellectual property is broadly defined in the Agreement to include such commonly viewed intellectual property as patent and trademark rights, but also, inter alia, processes, designs, computer programs, technical information, data, manufacturing, engineering and technical drawing, designs  and methodologies. (Powers Decl. Ex. 6 § 1).

Pfizer argues that the terms of the Agreement are not ambiguous and that there is no bona fide conflict over the meaning of the terms.  Initially, Pfizer contends that according to the plain definition of terms in the Agreement, ABI's obligation to indemnify is broad and extends to patent and trademark rights as well as technical information, data, processes, "know-how",

13

designs and methodologies that ABI applied in the design and manufacture of the e.p.t.® test. Moreover, Pfizer contends that in section 7.1(f) of the Agreement, ABI warranted that e.p.t.® was manufactured solely from its "Know-how."  Because the Armkel infringement claim implicated ABI's "Know-how," including the development of specific polyclonal/monoclonal antibodies as part of the test's general format, ABI was obligated to indemnify Pfizer for Armkel's claims.

In addition, Pfizer contends that the words "owned" and "controlled" within the definition of "Know-how" should be given their plain and ordinary meaning and do not limit ABI's indemnification obligation.  Pfizer does not provide a definition for  "own" and the parties do not contest its ordinary meaning – to have or hold as property[10].  However, Pfizer defines the word "control" as "to exercise restraining or directing influence over; to regulate" or "to have power over," Webster's Ninth New Collegiate Dictionary 283 (1987), which does not require possession or ownership.

Finally, Pfizer argues that ABI's and Apogent's proposed meaning of the indemnification term – that the only claims for which ABI would be liable would be claims arising from ABI's own proprietary information – renders the provision itself a nullity.  According to Pfizer, a third party would never have possession of any proprietary information relating to ABI's e.p.t.® test. In that regard, Pfizer relies on the testimony of Dr. Kate Murashige ("Murashige"), a patent expert, who testified that a patent claim could not be directed to proprietary information such as the make-up of a specific antibody "because if it really is proprietary. . . then there's no way they

---

[10]  The Court notes that a standard definition of the word "own" is "to have or hold as property." Merriam-Webster Dictionary 528 (1997).  Black's defines "own" as "to rightfully have or possess as property; to have legal title to."  Id. at 1137 (8th ed. 2004).

14

can be claiming it. . . it has to be publicly disclosed in order to be claimed. So the only way....this

could bring us within the ambit of a nexus to infringement would be if ABI had a patent itself on

the antibody." (Cross Certification Ex. 3, Murashige Tr. 123:18- 124: 13).  In other words, Pfizer

argues that because ABI's proprietary information is only in ABI's possession, this information

could never be infringed and the indemnification clause would never apply

     Apogent, on the other hand, argues that the indemnification provision is not a nullity.  It

argues that there are circumstances, albeit limited, in which the indemnification clause would

still be implicated and that it should be construed narrowly as the parties intended in the

Agreement.[11]  Apogent contends that despite the broad definition of "Intellectual Property" in the

Agreement, ABI's indemnification obligations in section 6.3 are significantly limited by the use

of the words "owned or controlled."  However, Apogent does not contest the definitions of

"Know-how" or "owned or controlled" and does not offer an alternative definition of the various

terms.  Instead, Apogent argues that because the technology for immunoassays, which was part

of Armkel's claim for patent infringement, was available in the public domain, it was not "owned

or controlled" by ABI.  Therefore, according to Apogent, the immunoassay technology does not

---

[11]Apogent also relies on Murashige's deposition in which she testified that there was a
possibility that two companies could develop the same process or result which would be
considered a trade secret.

        Q: Is it – is it under the law of trade secrets as you know it, and I know it does
        vary from state to state, is it possible for two companies to have the same trade
        secret?
        . . .
        Q: Could you explain the circumstances under which that might occur?
        A: Well. . . I guess there could be, just as a hypothetical, a process for
        manufacturing, let's say, the material that had the test zone in it that was being
        kept as a trade secret. And then, you know, it could coincidentally be that both the
        two companies would devise the same process or devise the same result.
(Cross Certification Ex. 3, Murashige Tr. 143:19- 144:12)

fall into the category of ABI's proprietary "Know-how" as it is defined in the Agreement and Armkel's claim based on that technology is not subject to ABI's indemnification obligation. Apogent contends that the only infringement claims it would be liable for would be claims arising from its proprietary "Know-how." Apogent additionally offers extrinsic evidence to show that ABI intended the term "Know-how" to narrow its obligation.

A court's primary objective when interpreting a contract is to derive the objective intent of the contracting parties at the time of making the contract as revealed by the contract language. Atlantic Northern Airlines Inc. v. Schwimmer, 12 N.J. 293, 301-02 (1953);  see also Caldwell Trucking PRP v. Rexon Technology Corp., 2005 WL 2092861 at *5 (3d Cir. August 31, 2005); In Re Combustion Engineering, Inc., 366 F. Supp. 2d 224, 229 (D.N.J. 2005); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980).  In determining the intention of the parties, a court may consider "the situation of the parties, the attendant circumstances and the objects they were thereby striving to attain."  Atlantic Northern Airlines Inc., 12 N.J. at 301. Moreover, under New Jersey law, extrinsic evidence is admissible to aid in the interpretation of an integrated agreement even when the contract, on its face, is free from ambiguity. Id. at 301-02.

However, it is important "to note that extrinsic evidence of negotiations and conduct of the parties is important to a court's analysis of whether an agreement is ambiguous only to the extent that the evidence provides 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995) (citing Mellon Bank, 619 F.2d 1001, 1011 (3d Cir. 1980).  Extrinsic evidence is not relevant for the purpose of changing the writing, but for the purpose of interpreting the writing and aiding in determining the meaning

16

of the contract.  Atlantic Northern Airlines Inc., 12 N.J. at 301-02.  If, for example, extrinsic evidence does not explain the meaning of the writing, but an intention that was unexpressed in the writing, it is not relevant.  Id.  Therefore, "the focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence...might cause a reasonable fact finder to understand the text differently."  American Cyanimid, 54 F. 3d at 182.  In determining the meaning of a contract, a court "cannot ignore the express language of the contract."  SmithKline Beecham Corp. v. Rohm & Haas Co., 89 F.3d 154, 159 (3d Cir. 1996)(citation omitted).

Before making a finding of whether a contract term is clear or ambiguous, the court "must consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation."  Heffron v. Adamar of New Jersey, Inc., 270 F. Supp.2d 562, 571 (D.N.J. 2003).  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.  Frank Briscoe Co., Inc. v. Travelers Indem. Co., 899 F. Supp. 1304, 1308 (D.N.J. 1995).  In determining whether contract language is ambiguous, courts are guided by the principle that a court should avoid interpreting contractual language in a way that makes any contract term meaningless.  In Re Combustion Engineering, 366 F. Supp. 2d 224 at 231.

The Court will initially consider the extrinsic evidence put forth by the parties.  See Heffron, 270 F. Supp. 2d at 571. Although Pfizer objects to the use of extrinsic evidence, this evidence is admissible in the first instance to determine whether the contract is clear or ambiguous and to understand the plain meaning of the contract terms.  However, to the extent that extrinsic evidence is used to contradict the terms of the Agreement, it is inadmissible and the

17

Court will not consider it.  <u>Atlantic Northern Airlines Inc.</u>, 12 N.J. at 302.  ("The 'parol evidence rule' purports to exclude testimony 'only when it is offered for the purpose of 'varying or contradicting' the terms of an 'integrated' contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms.").

As mentioned above, Apogent does not contest the definitions of "Know-how" or "owned or controlled" contained in the Agreement.  Instead, Apogent argues that despite the broad definition of Intellectual Property in the Agreement, ABI's indemnification obligations arising from section 6.3 were significantly limited by the use of the words "owned or controlled." In other words, Apogent argues that the indemnification obligation only required ABI to indemnify Pfizer for claims arising out of information or technology over which ABI had a property right.  To support its contentions, Apogent relies on extrinsic evidence including a Term Sheet which contained a draft of the proposed terms and the deposition testimony of an ABI lawyer and a Pfizer lawyer who were involved in the drafting of the Agreement.

First, Apogent contends that the original term sheet contained a broader indemnification provision than the final Agreement.  Specifically, Apogent notes that the term sheet provided that ABI "shall indemnify. . .against any claims. . .arising out of or in connection with the infringement or alleged infringement of any patent or technology by reason of manufacture, use or sale of product."  (Cross Certification Ex. QQ at 4).  On its face, the only difference between this term sheet and the final agreement is that the words "patent or technology" seem to have been replaced by the words "Patent or Know-how."  But "Know-how" was broadly defined in the Agreement and all forms of technology, design and manufacturing were included in its expansive definition.  Therefore, Apogent's reliance on the term sheets as evidence of an intent to limit the

circumstances triggering indemnification in the Agreement is unpersuasive and indeed, belied by the arguably more extensive definitions of "Know-how" and Intellectual Property in the Agreement.  Furthermore, it is reasonable to conclude that the "owned or controlled by ABI" provision distinguishes between Pfizer's intellectual property used in the manufacture of the e.p.t.'s® plastic housing and ABI's intellectual property used in the manufacture of the e.p.t.®.

Finally, Apogent argues that Catherine Costa, the Pfizer lawyer who drafted the agreement, and Richard Renkin, the attorney who ABI claims represented it at the time of the Agreement's drafting, believed that the Agreement contained a narrower indemnification agreement than in the term sheet through the use of the words "owned or controlled" and "Know-how."  However, Ms. Costa's deposition testimony is not so clear:

> Q: Do you recall any discussion in the negotiations about what those – that phrase owned or controlled?
>
> A: No specifics. No.
>
> Q: Anything general?
>
> A: I wold assume that it's to focus on the technology that's coming from FHC and ABI as opposed to anything Warner Lambert might have had in terms of its designs or exterior of the product.

 (Powers Second Decl. Ex. AK, Costa Dep. 36:22 -37:5).

Not only does Costa not recall any discussion about the terms, but her statement is speculative at best as to the intended impact of these words on the contract's meaning.  Similarly, Costa's testimony concerning the word "know-how" did not distinguish between "Know-how" and "know-how."  (Id. at 32:18-33:18).  Moreover, the questions did not refer once to the phrase

"know-how" in the context of the Agreement.  Instead, Costa's testimony focused on her general understanding of the term "know-how."

> Q: You've used the phrase "know-how" several times. What do you mean when you use that phrase?
>
> A: I'm using it broadly here to talk about the technology that relates to the product sold to us by ABI.
>
> Q: And it's your understanding – and when you use this phrase know-how, does that necessarily, does that mean only information that was proprietary to ABI?
>
> A: My recollection is that the ABI information that went into the product was proprietary.
>
> Q: My question is different...You have now just said you're using know-how in the broad sense.
>
> A: Right.
>
> Q: Is it your understanding that when you use the word know-how in its broad everyday sense, that that refers to information that is proprietary...to ABI?
>
> A: How I've been using it in our conversation, the answer is yes, that it would be proprietary to ABI.

(Id.).

Although Costa's testimony may raise some questions as to the meaning of "know-how" in her view, it does not shed any additional light on the use of the term "Know-how" in the Agreement itself.  Moreover, the Court must construe these words in light of the agreement as a whole, especially where, as here, the terms are defined in the Agreement.  See In Re New Valley Corp., 89 F.3d, 143, 149 (3d Cir. 1996)("A court cannot interpret words in a vacuum, but rather

must carefully consider the parties' context and the other provisions in the plan.). See also e.g., Atlantic Northern Airlines, 12 N.J. at 301. ("The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety."); Restatement (Second) of Contracts § 203 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect."). Finally, Ms. Costa's testimony does not conflict with a straightforward reading of the language of the Agreement itself[12]. For example, Costa testified that WL "viewed [e.p.t.®] as [ABI's] technology, but it was going in to our product. . . [WL] really had no technology in-house. At most we might have had some designs for the exterior of the product, but in terms of how the product worked, that technology all came from ABI and Dr. Chang and we put our confidence in them for all the technology and know-how." (Id. at 22:10-23:8).

Apogent also relies on the testimony of Richard Renkin, an attorney at ABI, to support its interpretation of the contract. The parties, however, dispute Renkin's role and whether he was present during the negotiations. According to Pfizer, Renkin's name first appeared as a copy recipient on a letter dated April 1997 – four years after the negotiations and drafting occurred. (Pfizer Additional Fact Statement ("Pfizer Addtl. FS") at ¶ 120). Moreover, according to Costa's testimony, ABI's lawyer during the drafting and negotiations was Stephen Feuerstein; indeed, Feuerstein's name appears on the Agreement as the person to receive notices from Pfizer that pertained to the Agreement. (Pfizer Addtl. FS at ¶ 103-05). However, the whereabouts of Feuerstein are unknown to both parties. (Apogent Reply Brief in Support of its Mot. for SJ at

_____

[12] See discussion infra pp. 24-26.

13).  In addition, despite Feuerstein's name on the documents, Renkin did not know who

Feuerstein was or whether he was involved with the negotiation or drafting of the Agreement.

(Powers Second Decl. Ex. AL, Renkin Tr. 19).

> Not only do the parties dispute Renkin's involvement, but the Court notes that Renkin's

deposition testimony is not helpful.  During his deposition Renkin testified that he remembered

"discussions about the phrase 'owned and controlled'" and that Pfizer "would be responsible for

things like know-how." (Id. at 33:13-33:21.)  However, Renkin could not remember the names or

gender of the people with whom he was negotiating. (Id. at 16:15-18; 17:18-25; 19:10-23).

Moreover, Renkin's testimony also makes clear that he did not distinguish between "Know-how"

and "know-how" either at his deposition or at the time the Agreement was being drafted.[13]   In

contrast to Renkin's testimony, the express language of the Agreement uses those words in

distinct ways.  Because the distinction between "know-how" and "Know-how" is important in

determining the meaning of the Agreement, the Court cannot reasonably rely on Renkin's

---

[13] Q: Can you tell me why – well, do you see how it says "Intellectual property means,"
and it starts this list of things?
A: Which includes know-how.
Q: Correct.
A: Okay.
Q: With a small "k", right?
A: Well, are you trying to say that the know-how, as defined in here, is different from the
know-how, which is beginning the next sentence and has a capital in the next sentence
because it's the first word in the next sentence? Are you trying to say those are two
different things?
Q: I think they are, under the way the agreement is worded.
A: Well, I don't.
. . . .
A: Well, I think you're reading the capital "K" into it inappropriately, because the capital
"K" under know-how, it's just the first word in the sentence. So it's capitalized. So how
does that capital vary from the capital under intellectual property?
(Renkin Tr. 34:18-35:21).

testimony in resolving this dispute.

In looking at the extrinsic evidence, it is important to remember that while outside evidence is relevant and permissible in determining whether contract language is ambiguous, the terms of the contract should be given their "plain and ordinary meaning" unless the circumstances dictate that a special meaning should attach. Williston on Contracts § 32.3 ( 4th ed.). Furthermore, "a party that uses unambiguous terms in a contract cannot be relieved from the language simply because it had a secret, unexpressed intent that the language should be interpreted contrary to the words' plain meaning." Schor v. FMS Financial Corporation, 357 N.J. Super. 185, 191 (N.J. Super. Dec. 30, 2002).

According to the plain language of the Agreement, ABI was responsible for the indemnification of all infringement claims based on its "Know-how." The Agreement defines "Know-how" as "Intellectual Property." The latter term is characterized as including such traditional intellectual property as trade secrets, but it also includes data, information, methodologies, processes and "know-how" (with a lower case "k"). Importantly, Black's Law Dictionary defines "know-how" as "the information, practical knowledge, techniques, and skill required to achieve some practical end, esp. in industry and technology; Know-how is considered intangible property in which rights may be bought and sold." Black's Law Dictionary 888 (8th ed. 2004). Despite the inconclusiveness of Black's definition of "know-how" and whether it encompasses only proprietary information, the Agreement itself defines Intellectual Property to include both proprietary and non-proprietary elements including "know-how" itself. Even if the definition of "know-how" is somehow limited to proprietary information, the definition of "Know-how" is much broader consisting of both intellectual property such as trademark and

patent rights and non-proprietary information, such as data, information, methodologies and

processes.  Therefore, the Court finds that the Agreement's broad definition of "Know-how"is

controlling.

Moreover, the Court must construe the meaning of "Know-how" in light of the remaining

words in the term's definition, since the Agreement is an integrated document.  See In Re New

Valley Corp., 89 F.3d at 149; American Cyanamid Co., 54 F.3d 181-82.  "Know-how" is

defined as Intellectual Property "owned **or** controlled" by ABI.  The Court finds that the

Agreement's use of the word "or" is essential in this dispute; the disjunctive "or" between the

words "owned" and "controlled" suggests that the parties intended the words to have different

meanings and for either concept to apply.  The word "owned" clearly requires ownership or

possession; however, the word "control" is broader and does not necessarily implicate

ownership.  When an entity owns something, it has a property right in that object[14]; however, an

entity is able to control – direct or regulate  – something without owning it.[15]

Despite the plain meaning of the words, ABI relies on the testimony of one of Pfizer's

experts, Edward Fiorito ("Fiorito"), for the proposition that the use of "owned or controlled"

means outright ownership or control in the sense of being able to pass on some sort of property

right. (Apogent Ex. 3, Fiorito Tr. 121:1-124:3.)  However, Fiorito's testimony is less than

illuminating, not only because of the plain meaning of the words, but because the deposition

questions referred specifically to patents and the control of a patent.  (Id.)  Indeed, control over

---

[14]See discussion supra n.10.

[15] See discussion supra p.14.  Also, Black's Law Dictionary defines "control" as "to
exercise power or influence over; to regulate or govern."  Black's Law Dictionary 353 (8th ed.
2004).

"Know-how" was neither mentioned nor discussed at Fiorito's deposition. Because a patent, unlike "Know-how" is something that is inherently owned[16], Fiorito's deposition is inapplicable to the narrow and distinct issue here -- "control" over the "Know-how" involved in the manufacture of the e.p.t.® test. Therefore, the Court finds that although the words "owned or controlled" may have limited ABI's obligation, they do not narrow the obligation in the expansive manner Apogent suggests.

Also telling is the Agreement's definition of Intellectual Property as referenced in section 7.1(f), the warranties provision. In section 7.1(f), ABI warranted that it owned the patent rights that were necessary to manufacture the e.p.t.® test. Specifically, section 7.1 provides that "ABI has interests in or license or other rights to use the Intellectual Property disclosed in Schedule C in respect of the Products. ABI either has all right, title and interest in or a valid and binding right under contract to use the Know-how and each item of Intellectual Property disclosed in Schedule C. No other Intellectual Property other than Know-how is used or necessary to develop, manufacture, supply and market the Products." However, pursuant to Schedule C, the patents involved were limited to a single one, U.S. Patent No. 5,006,474. Unlike this single patent involved in the manufacture of the e.p.t.®, ABI also warranted in 7.1.(f) that the e.p.t.® was manufactured solely from its "Know-how", and, the Agreement imbued "Know-how" with a broad definition that included manufacturing, processes and data.

_____

[16] See 35 U.S.C.A. § 261 ("Subject to the provisions of this title, patents shall have the attributes of personal property."). See also Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U.S. 637, 643 (1947) ("A patent is a species of property. It gives the patentee or his assignee the 'exclusive right to make, use, and vend the invention or discovery' for a limited period. . .That is to say, it carries for the statutory period 'a right to be free from competition in the practice of the invention.'")(citation omitted).

Furthermore, the parties concede that Pfizer did not have any access to the information that ABI used to manufacture the e.p.t.® test, (Pfizer FS at ¶¶ 23-24, 33-38), nor did Pfizer dictate the processes or methodologies with which ABI made the e.p.t.®.  In short, ABI had the sole right and obligation to choose among the various processes and methods available to manufacture the e.p.t.®.  (Pfizer FS at ¶¶ 4, 5, 13, 16, 23, 28-33; Apogent FS at ¶¶ 21, 41).  Because ABI had control over the processes, data, information and methodologies involved in manufacturing the e.p.t.® – whether or not available in the public domain – the Court finds that ABI had control over the "Know-how" involved in the manufacture of the e.p.t.®.  Therefore, as a matter of express contract language, ABI's indemnification obligation is not specifically limited to proprietary information owned by ABI, but also includes information and technology that ABI used to manufacture the e.p.t.® that it may denominate as non-proprietary.

Additionally, the Court will briefly address the parties' arguments concerning the characterization of the indemnification clause as a nullity.  Although Apogent argues that the indemnification clause has some meaning even if it only includes claims relating to ABI's proprietary information, the Court finds it difficult to discern a situation where this would realistically arise.  On the other hand, it is not an impossibility that two people or entities could coincidentally and independently develop the same product or idea[17].  However, a decision on this issue is unnecessary because the Court finds that the indemnification clause obligates ABI to indemnify Pfizer for claims arising out of both the proprietary and non-proprietary information ABI used to make the e.p.t.® test.

Finally, Pfizer argues that the Court should look at the conduct of the parties under the

---

[17]. See Murashige Dep. Testimony supra n.11.

26

existing agreement as relevant evidence of meaning and intent.  Specifically, Pfizer directs the

Court's attention to ABI's previous agreements to indemnify Pfizer in connection with the

Inverness patent lawsuits.  Pfizer is correct that a court may consider the conduct of the parties in

determining meaning of contract terms, see e.g. Kamaratos v. Palias, 360 N.J. Super. 76,86 (N.J.

Super. Ct. App. Div., 2003) ("The manner in which the parties by their conduct indicate their

own understanding of their agreement is an appropriate source to which to turn to determine the

scope and meaning of their agreement."); Joseph Hilton & Associates Inc. v. Evans, 201 N.J.

Super. 156, 171 (N.J. Super. Ct. App. Div., 1985)("[T]he conduct of the parties after execution

of the contract is entitled to great weight in determining its meaning.").  However, the parties'

prior course of dealing under an agreement is only relevant when a contract term is ambiguous;

when a contract term is not ambiguous, a court will not consider the parties' prior course of

dealing.  Morris v. Fauver, 153 N.J. 80, 103 (N.J. 1998) ("Where a contract is ambiguous, courts

will consider the parties' practical construction of the contract as evidence of their intention and

as controlling weight in determining a contract's interpretation; where the terms of a contract are

clear, however, the court must enforce it as written."); see also Cumberland County Improvement

Authority v. GSP Recycling Co., Inc., 358 N.J. Super. 484, 496 (N.J. Super. Ct. App. Div.,

2003).  Here, both Pfizer and Apogent contend that the language in this Agreement is not

ambiguous.  The Court agrees and thus will not consider the parties' prior conduct under the

supply Agreement in its determination.[18]

---

[18]Moreover, there are substantial disputes between the parties as to why Apogent agreed
to defend and indemnify Pfizer in the Inverness cases. Apogent notes that in both cases, it
initially had objected, and later agreed, to the indemnification for business reasons.  These
disputes do not make the agreement to defend convincing evidence of the parties' intent as to the
scope of the Agreement.

In sum, the Court holds that ABI's obligation to indemnify Pfizer extends to both the proprietary and non-proprietary elements that ABI used to manufacture the e.p.t.® and therefore, that ABI's indemnification obligation was triggered by the Armkel patent infringement claims.

C. The Consent Provision

The Court now turns to the issue of whether Pfizer had a duty to seek ABI's consent before it settled the Armkel claims.  The issue presented here is the effect, if any, of the Agreement's consent to settle provision once ABI refused to indemnify Pfizer according to section 6.3 of the Agreement.  The original consent provision required ABI to get WL's written consent prior to "resolv[ing] any claim or potential claim, Action or Proceeding relating to the Products, Patents or Know-how."  (Powers Decl. Ex. 6 § 6.5(a)).  Pursuant to the 2001 Amendment, section 6.5(a) was amended to require both ABI and WL's consent to prior to a settlement by the other party.  The substituted language reads: "Neither ABI nor WL shall settle or otherwise resolve any claim or potential claim, Action or Proceeding relating to the products without the prior written consent of the other party, which consent shall not be unreasonably withheld." (Powers Decl. Ex. 7 ¶ 14).

Initially,  Pfizer contends that the consent provision had expired at the time of the Armkel suit.  According to Section 9.1 of the Amendment, "[u]nless terminated in accordance with the provisions of this Section 9, this Agreement shall terminate on June 30, 2002."  Pfizer argues that although both the Agreement and the Amendment specify various provisions that were to survive termination of the Agreement, neither document lists section 6.5, the consent provision, as among the surviving obligations.  Therefore, Pfizer argues, the consent provision was terminated

on June 30, 2002.  Since Pfizer was not served with Armkel's complaint until September 9, 2002, Pfizer contends that it was no longer bound to seek ABI's written consent before settling. The Court does not agree.

Although the amended consent provision does not expressly state that it would survive termination of the contract, section 9.4 of the original Agreement provides that "the provisions with respect to indemnification. . . in Section 6" would survive termination of the Agreement. Section 6 contained two provisions – 6.3 and 6.5 –  that pertained to the indemnification obligation; specifically, section 6.3 set out the claims that would implicate the indemnification obligation and section 6.5 contained the consent provision.  Importantly, section 9.4 was not deleted or changed in any way by the Amendment; the requirements of section 9.4 continued to exist as part of the Agreement.

Moreover, the consent provision was an integral part of the indemnification agreement. The consent clause required that each party get written consent from the other party before settling any claims relating to the e.p.t.®.   In addition, the original Agreement only required that ABI get Pfizer's written consent prior to ABI's settlement; however, the Amendment expanded these obligations to require that Pfizer also get ABI's written consent prior to Pfizer's settlement of claims.  For these reasons,  the Court finds that although the express language of the Agreement does not specifically exempt the consent provision from termination, as a matter of contract interpretation, and looking at the agreements as integrated documents, the consent provision survived the termination of the Agreement.

However, Pfizer also argues that when ABI refused to defend and indemnify it for the Armkel infringement claims, ABI breached its obligation and repudiated the Agreement between

the parties.  Pfizer contends that because ABI's breach was material, Pfizer was no longer bound

by the provisions of the Agreement including the consent-to-settle provision. Therefore,  Pfizer

argues that it was not required to obtain ABI's consent before settling with Armkel.

Conversely, Apogent argues that the Agreement's consent provision unambiguously

required Pfizer to get ABI's consent before settling any claim or dispute relating to the e.p.t.®

Apogent contends that, "ABI's right to consent went hand-in hand with any obligation it may

have to indemnify."  (Apogent's Mot. at 46).    Because Pfizer did not get ABI's consent before

settling with Armkel, Apogent contends that Pfizer's third-party complaint should be dismissed.

Generally, when one party to a contract fails to perform its essential obligations under the

terms of the contract, that party has committed a material breach and the non-breaching party

may treat the contract as terminated and refuse to perform its remaining obligations.  <u>See</u>

<u>Medivox Productions Inc. v. Hoffman La-Roche, Inc.</u>, 107 N.J. Super. 47, 58-59 (N.J. Super. L.

1969); <u>Frank Stamato & Co v. Lodi</u>, 4 N.J. 14, 21-22 (N.J. 1950).   This basic principle applies to

indemnification agreements and the obligations that flow therefrom.  Moreover, this principle has

been applied to settlements in the insurance context – indeed most cases dealing with this issue

arise in insurance cases – including the obligation to give notice and obtain consent to settle.

Hence, in New Jersey "[w]hile the right to control settlements reserved to insurers is an

important and significant provision of the policy contract (citations omitted), it is a right which

an insurer forfeits when it violates its own contractual obligation to the insured."  <u>Fireman's</u>

<u>Fund Insurance Company v. Security Insurance Company of Hartford</u>, 72 N.J. 63, 71-72 (N.J.

1976).

In <u>Baen v. Farmers Mutual Fire Insurance Co.</u>, an excess insurance carrier denied

30

coverage to an insured.  318 N.J. Super. 260, 262-64 (N.J. Super. Ct. App. Div. 1999).

Thereafter, the primary insurers provided a defense to the insured and entered into settlement

negotiations without apprising the excess insurer of the negotiations or that its excess policy was

at risk.  Id.  In Baen, the Court held that because the excess carrier had initially denied coverage,

it was effectively removed from participating in the lawsuit brought by the plaintiff and was

similarly estopped from "asserting any claim it may have had against third-party defendants for

breach of the duty of good faith."  Id. at 272.  Moreover, the court held that the primary insurer

did not owe a fiduciary duty to the excess insurer and was not required to give notice of

settlement negotiations once the excess insurer had disclaimed coverage under the policy.  Id. at

272-73.

Similarly, in Dominic v. Hess Oil Virgin Islands Corp., a non-insurance case, Hess had

entered into an indemnification agreement with Communications Systems & Maintenance

("CSM") as part of a contract for construction and maintenance at an oil refinery. 624 F. Supp.

117, 118 (D.V.I. 1985).  When a maintenance worker was injured while working at the refinery,

Hess requested that CSM defend it pursuant to the parties' indemnification agreement.  Id.  CSM

refused and Hess eventually settled with the worker.  Id.  Hess then notified CSM of its

settlement and requested indemnification for the settlement amount.  Id.  CSM ignored the letter

and Hess brought suit seeking indemnification under the parties' agreement.  Id.  In Dominic, the

court held that because the worker's injuries stated a claim that would have come within the

parties' indemnification agreement, CSM should have accepted the defense.  Id. at 119-120.

Moreover, the court held that "[h]ad CS&M met its initial obligation to take over the defense of

[Hess], there is no question it would be entitled to dictate litigation strategy and raise such

defenses as it considered appropriate. By failing to even defend, however, we find that CS&M is

estopped from criticizing HOVIC's strategy as a means of escaping obligations under the

indemnity agreement." Id. at 120.   It is important to note that although Hess (unlike Pfizer)

notified CSM that it had reached a settlement for $50,000, Hess seems to have only notified

CSM after a settlement amount had been reached, and, at which point Hess requested

indemnification from CSM for the settlement amount.  Id. At 119-120.  Therefore, the dispute in

Dominic is quite similar to the dispute at hand.

Although Baen involved a contract between a primary and an excess insurance carrier,

and Dominic involved a claim for personal injury, the courts' holdings are illustrative in this

dispute.  While the contract at issue here was neither an insurance contract nor a stand-alone

contract for indemnification, but a supply agreement under which ABI agreed to sell to Pfizer its

e.p.t.® pregnancy test for a specific period of time, the indemnification provision was a key

provision of the Agreement.  According to their depositions, the parties spent considerable time

negotiating and drafting the indemnification clause.  Moreover, the Amendment expressly

exempted the indemnification clause from the termination of the contract, "ABI's and WL's

obligations under this Section 6.3 shall survive termination or expiration of this Agreement."

(Powers Decl. Ex. 7 at ¶ 12(d)).  However, when Pfizer notified ABI of Armkel's claims and

requested a defense under the Agreement, ABI refused.  ABI's refusal to defend and indemnify

was a breach of the indemnification clause.  This breach, in turn, released Pfizer from its

obligation to secure ABI's consent to settlement.  For these reasons, the Court finds that Pfizer

was not bound to inform ABI of the settlement negotiations with Armkel and obtain ABI's

consent for settlement.

D. Good Faith and Reasonableness of Amount of Settlement

It is well-settled in New Jersey "that where an insurer fails to defend an insured, 'a settlement [entered into by the insured and a third party] may be enforced against an insurer... if the settlement is reasonable and entered into in good faith.'" Excelsior v. Pennsbury, 975 F. Supp. 342, 355 (D.N.J. 1996) (citing Griggs v. Bertram, 88 N.J. 347, 368-69 (N.J. 1982)).  A settlement that is unreasonable in amount or entered into in bad faith is not enforceable, and the insurer bears the ultimate burden of showing these "frailties in the settlement."  Transportes Ferreos de Venezuela II CA v. NKK Corporation, 239 F.3d 555, 562 (3d Cir. 2001).

Initially, the Court notes that the parties do not dispute that ABI refused to defend and indemnify Pfizer for the Armkel claims.  Pfizer undertook the defense of the claims and contends that it settled the Armkel claims in good faith for a reasonable amount.  In deciding whether to settle and in what amount, Pfizer considered several factors including: that Armkel's initial estimation for damages was $37 million and its initial offer for settlement was $25 million; that the defenses to infringement were weak; and that Armkel was seeking enhanced damages for willfulness.  Moreover, Pfizer sought to avoid exposure for prejudgment interest and attorney's fees.

Conversely, Apogent contends that summary judgment should be granted in its favor because Pfizer did not attempt to allocate the settlement amount among the covered and uncovered claims including claims for which ABI has no indemnity obligation.  In the alternative, Apogent argues that summary judgment for Pfizer regarding the settlement is inappropriate because there are significant issues of material fact concerning both the basis for

33

the settlement and the amount.  First, Apogent points out that Pfizer did not allocate the amount among the various claims.  Second, Apogent faults Pfizer for not making a claim for indemnification against Mizuho under the Armkel infringement claims.  Moreover, Apogent contends that if the Mizuho-supplied e.p.t.® did not infringe the patent, then $18 million was not a reasonable settlement amount; conversely, if the device did infringe, then Apogent is not liable for the whole amount and the settlement was still unreasonable.  Apogent also argues that the settlement was not reasonable because Pfizer did not undertake a sufficient fact investigation concerning its liability on the claims and possible defenses.

The Court will initially address Apogent's motion for summary judgment based on Pfizer's failure to allocate the claims.  In Cooper Laboratories Inc., v. International Surplus Lines Insurance Company, 802 F.2d 667, 674 (3d Cir. 1986), the court discussed the issue of equitable apportionment among covered and uncovered claims under an insurance policy.  There, the court recognized that a factual question exists when an insured settles claims against it without determining the amount attributable to claims covered by the policy and those that are not covered by the policy.  Moreover, the court in Cooper favorably cited American Home Assurance Co. v. Libbey-Owens-Ford Co., 786 F.2d 22 (1st Cir. 1986), for the proposition that when an insured settles claims against it without allocating the between the covered and the uncovered claims, the "apportionment [should] be made by the district court based on such evidence as was available, despite the potential for testimony colored by hindsight and self-interest." Cooper, 802 F. 2d at 674.  Thus, Pfizer's failure to allocate separate amounts to the various claims is not a basis for rejecting Pfizer's settlement in toto.  Instead, the Court finds that there are factual questions and denies Apogent's motion for summary judgment on this issue.

34

Turning to the issue of reasonableness and good faith, the New Jersey Supreme Court has explained in the insurance context that the "initial burden of going forward with proofs of these elements rests upon the insured and the ultimate burden of persuasion as to these elements is the responsibility of the insurer.  Thus, the insured has primary burden of proving that settlement was prima facie reasonable in amount and untainted by bad faith." Griggs, 443 A.2d at 173. Moreover, the Griggs Court explained that because the insured "had control of the case and the opportunity for discovery as to all essential information. . .the insured can best marshall the basic facts relating to settlement." Id.

However, the insured does not need to establish actual liability to the party with whom it has settled in order to meet this burden.  The insured may meet its burden by establishing "potential liability on the facts known to [it]...culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured." Luria Brothers and Co. v. Alliance Assurance Co. Ltd., 780 F.2d 1082, 1090 (2d Cir. 1986).  Further, in deciding whether a settlement is reasonable, a court must "consider the risk to the settling parties. It is the extent of the defendant's exposure to liability and not mere allegations in the plaintiff's complaint that govern the appraisal of reasonableness." Vargas v. Hudson County Board of Elections, 949 F.2d 665, 674 (3d Cir. 1991).  Some factors that a court may look to in determining reasonableness of the settlement include: the possibility of exposure to a jury verdict in excess of settlement, the length of the negotiation period, the discrepancy between the plaintiff's initial demand, and the ultimate settlement figure. Kitchnefsy v. National Rent-a-Fence of America Inc., 88 F. Supp. 2d 360, 370 (D.N.J. 2000).

Although this is not an insurance case, the same principles apply to this suit for

contractual indemnification.  As noted above, the initial burden of proving that the settlement agreement was reasonable and untainted by bad faith rests with Pfizer. "[R]easonableness and good faith require that the insured expend efforts to determine whether the claims are valid and whether the amount proposed is reflective of the injuries claimed." Pennsbury, 975 F. Supp. at 357.  However, it is important to note that the Griggs standard puts the burden on the insured as the party in the best position to determine the facts related to an insurance settlement; unlike Griggs, Pfizer and ABI were not parties to an insurance agreement, but to a supply agreement that contained an indemnification obligation.  ABI was more than a mere insurer of the e.p.t.® product, it was the manufacturer and supplier as well.  Therefore, ABI would likely have more facts relating to the Armkel claim at its disposal than the typical insurer in an indemnification dispute with its insured.

In determining whether to settle, Pfizer relies on some of the factors discussed above, including the extent of its exposure for liability and the difference between Armkel's initial demand of $37 million and the ultimate settlement figure of $18 million.  Moreover, during the settlement meetings, Armkel had put forth a new theory of damages under which its claim was greater than $37 million.  (Pfizer FS at ¶¶ 80-81).  Pfizer also considered that its defenses to the infringement claim were weak, specifically relying on the 1998 discussions with ABI's in-house counsel, who advised both Pfizer and ABI that the e.p.t.® device appeared to infringe the '389 patent.  (Pfizer's FS at ¶ 82).   In addition, Pfizer considered that Armkel was likely to seek enhanced damages for willfulness, (Powers Decl. Ex. T, Sturman Tr. 188-190), and the probability of an award of prejudgment interest and attorney's fees.  (Pfizer Mot. for SJ at 22.)

Conversely, Apogent argues that Pfizer's settlement with Armkel was neither reasonable

36

nor in good faith because Pfizer did not undertake a sufficient fact investigation concerning its liability on the claims and possible defenses.  However, as noted above, ABI's attorney had previously advised Pfizer and ABI that  their defense to these patent infringement claims was weak.[19]

Moreover,  Apogent also argues that the settlement should not be honored because Pfizer did not settle the Mizuho claims in good faith.  Apogent relies on the deposition of Pfizer's corporate designee, Paul Sturman, to prove Pfizer's lack of good faith in the Armkel settlement, including its decision not to seek indemnification from Mizuho for any portion of the settlement that is attributable to infringement caused by the Mizuho-supplied e.p.t.®.  (Powers Decl., Ex. T, Sturman Tr.).  The Court finds that this raises fact issues not resolvable on this motion for summary judgment.

Apogent additionally argues that there are factual disputes preventing summary judgment on the reasonableness of the settlement amount.  Specifically, Apogent contends that if the Mizuho-supplied e.p.t.® did not infringe the patent, then $18 million was not a reasonable settlement amount; conversely, if the device did infringe, then Apogent is not liable for the whole amount and the settlement was still unreasonable.  In addition, Apogent argues that there are issues of material fact concerning the settlement amount because Pfizer did not allocate the settlement amount among the various claims including: the Armkel claims from the ABI-supplied e.p.t.® product and the Mizuho supplied e.p.t.® product; a release of Armkel's claim for past Pfizer sales of e.p.t.® made by Mizuho; a grant of a one year fully non-exclusive license which allowed Pfizer to continue selling e.p.t.® made for it by Mizuho for another year; and

---

[19]See discussion supra at 8-9.

claims for punitive damages based on Armkel's claim of willful infringement.

 Because the proportions of Pfizer's and ABI's liability for the e.p.t.® product are unclear, and because there was no allocation of the settlement amount for the ABI-supplied e.p.t.® product as opposed to the Mizuho product, the court finds that summary judgment is inappropriate because significant issues of material fact remain concerning the reasonableness and amount Pfizer paid to settle.  See Cooper Laboratories Inc., v. International Surplus Lines Insurance Co., 802 F.2d 667, 674.  Therefore, the court denies Apoent's and Pfizer's respective Motions for Partial Summary Judgment regarding the reasonableness of the settlement.


E. ABI's Motion to Dismiss

 Finally, the Court will consider ABI's motion for Summary Judgment dismissing Pfizer's third-party complaint.  ABI argues that pursuant to the Assignment and Assumption Agreement ("Assumption Agreement") between ABI, Apogent and Pfizer, Apogent guaranteed to Pfizer "the timely performance by ABI of all of ABI's obligations and liabilities to [Pfizer] under this agreement and the [Pfizer] Supply Agreement; provided. . .that [Apogent's] liability. . . shall in no event exceed $25,000,000." (Kerner Decl. Ex. C ¶ 9).  The Assumption Agreement was signed by ABI and WL, Pfizer's predecessor.  ABI argues that because the settlement amount at issue is $18 million – less than the maximum amount under Apogent's guarantee  – Apogent, and not ABI,  is liable under the guarantee.

 Moreover, ABI argues that when Apogent sold ABI to Inverness, Apogent indemnified ABI for its obligations and liabilities to Pfizer.  In section 7.2 of the Stock Purchase Agreement, Apogent agreed to indemnify, defend and hold ABI and Inverness harmless in connection with

38

any claims brought by Armkel or Pfizer relating to sales of ABI products.  (Kerner Decl. Ex. D. at § 7.2).   Therefore, ABI contends that to the extent it is liable to Pfizer for indemnification pursuant to the Agreement, Apogent has indemnified ABI for any liability and thus Pfizer's third party complaint must be dismissed.

Conversely, Pfizer contends that pursuant to Apogent's guarantee of ABI's obligations in the Assumption Agreement, ABI and Apogent are jointly liable for ABI's breach of the Agreement with Pfizer.   Pfizer argues that while ABI and Apogent may have a separate indemnification agreement under which Apogent agreed to indemnify ABI for its obligations and liabilities under the Agreement with Pfizer, that indemnification agreement is between ABI and Apogent alone.  Pfizer contends that the only additional agreement to which it was a party was the Assumption Agreement and if, for some reason, Apogent is unable to satisfy its guarantee obligation, then Pfizer should still able to recover from ABI pursuant to the Assumption Agreement.  Therefore, Pfizer argues that the Court should not grant summary judgment on ABI's motion to dismiss Pfizer's third-party complaint against it.  The Court agrees.

In section 10 of the Assumption Agreement, the parties agreed that New York law would govern the provisions and enforcement of the Assumption Agreement.  Although neither ABI nor Pfizer cite any relevant case law, in New York, a guarantee is "a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person liable to pay or perform the obligation fails. . . A court must look to the language of the specific guaranty to determine the nature of the guaranty."  New York City Dept. of Finance v. Twin Rivers Inc., 920 F. Supp. 50, 53 (S.D.N.Y. 1996); see also e.g. Midland Steel Warehouse Co. v. Godinger Silver Art Ltd., 714 N.Y.S.2d 466, 468, (N.Y. Sup. Ct. App. Div. First Dept. 2000)("A guarantee is an

agreement to pay a debt owed by another which creates a secondary liability and thus is collateral to the contractual obligation.'")(citations omitted).  Under the Assumption Agreement which was signed by Apogent, ABI and Pfizer, Apogent did not assume ABI's obligations to Pfizer but instead, guaranteed ABI's performance of its obligations.  That is an important distinction. Clearly, Apogent is a party to this dispute because of the Assumption Agreement and the Court notes that Apogent has zealously defended ABI's interests throughout this dispute.  However, under New York Guarantee Law, the Assumption Agreement between Apogent, ABI and Pfizer created secondary liability for Apogent on ABI's obligations to Pfizer.  Therefore, the Court finds that both parties remain liable under the Assumption Agreement.

Moreover, despite ABI's reliance on the Stock Purchase Agreement as proof that Apogent will indemnify ABI for ABI's obligations and liabilities under its Agreement with Pfizer, the indemnification obligation in the Stock Purchase Agreement was between Apogent and ABI.  Neither Pfizer nor WL were parties to the Stock Purchase Agreement.  Furthermore, although no party cited any case law, it is important to note that indemnification agreements differ substantially from guarantees.  Specifically, "[a]n indemnity contract differs from a guaranty in that the former is an original rather than a collateral undertaking, and generally undertakes to make good the promisee's loss resulting from his liability to another, rather than from another's liability to him." 38A C.J.S. Guaranty § 6 (1996).  Although Pfizer was a party to the Assumption Agreement with Apogent and ABI, Pfizer was not a party to Apogent and ABI's indemnification agreement.  Therefore, the Court finds that while Apogent may have indemnified ABI's obligations under its agreement with Pfizer, this agreement has no affect on Pfizer's ability to recover from both parties in the event that ABI is found liable under its Agreement with

40

Pfizer.  For these reasons, the Court denies ABI's motion for Summary Judgment.


**III. CONCLUSION**

     For the reasons discussed herein, Pfizer's Motion for Partial Summary Judgment is

GRANTED in part and DENIED in part.  Apogent's and ABI's Motions for Summary Judgment

are DENIED. An appropriate order will follow.


Dated: September 29, 2005          /s/ Freda L. Wolfson_____
                                 Honorable Freda L. Wolfson
                                 United States District Judge